JACOB SELIGMAN, MAX HEAVENRICH AND CARL HEAVEN-
RICH v. ESTATE OF EGBERT TEN EYCK.

[See 48 Mich. 230.]

*Contracts—Res gestæ—Assignee's right—Employee's admissions—Memo-
randa on books of business—Delivery and acceptance of contract
—Exclusion of evidence—Facts known to decedent.*

The assignees of a contract to sell and deliver logs brought suit upon
it against the estate of the other party, who had died. They put in
evidence a memorandum indicating, as they claimed, that evidence of
the fulfillment of the contract existed on decedent's books. It had
no tendency in itself to prove this, but they were also allowed to
show, in connection with it, a computation by decedent's book
keeper and certain alleged conversations with him, on which they
had relied as inducements in purchasing the claim. *Held* that this
was not properly admissible as *res gestæ* to show the good faith of
the assignment, nor as bearing on the merits.

Assignees of a contract can take such rights only as belonged to the
assignor. In an action on the contract, therefore, the consideration
for the assignment cannot concern the defense, and the introduction
of testimony which would suggest superior equities in a *bona fide*
purchaser of the claim, would mislead.

A book-keeper's admissions cannot bind his employer in an action against
the latter upon a contract made with plaintiff's assignor.

Where the business books of a decedent are relied on to charge his
estate, *it seems* to be erroneous to admit, apart from its context and
as independent evidence for a particular purpose, a memorandum
entry which could only be important when incorporated with the
accounts of the decedent; and the false impression so produced can-
not be supposed to be done away with by the subsequent reception
of the books on the part of the defense, even though they show that
the entry had never entered into the accounts or been regarded in the
balances.

Where a written agreement, drawn to be executed by the party making
it and signed by him only, is found among the papers of the other
party after the latter's death, it is presumed to have been delivered;
and its retention raises a presumption of acceptance which must be
overthrown by proof before it can be avoided.

In an action involving a contract alleged to have been made with a
deceased person, facts relating to its delivery to a third person before

decedent received it, may be shown by the testimony of the other party, if decedent had not known them.

Where a trial judge, in excluding objectionable testimony, declines to exclude what relates to a certain matter, that is involved with the rest, its effect cannot be supposed to have been fully destroyed.

It is erroneous to direct the attention of the jury to undisputed facts as if they were doubtful.

Error to Saginaw. Submitted June 23. Decided Oct. 4.

APPEAL from probate order confirming the report of commissioners upon an estate, rejecting a claim. The estate brings error. Reversed.

*Wheeler & McKnight* for appellant. Signing a contract and leaving it in the hands of the other party's attorney, without directions, is a delivery: *Gage v. Gage* 36 Mich. 230; *Thatcher v. St. Andrew's Church* 37 Mich. 268; *Hosley v. Holmes* 27 Mich. 425; possession is *prima facie* evidence of delivery: *Patrick v. Howard* 47 Mich. 40.

*W. S. Tennant* for appellee. There is no contract if both parties do not assent to it, and to the same thing in the same sense: Pars. Cont. 475; *Eggleston v. Wagner* 46 Mich. 610.

CAMPBELL, J. Plaintiffs, as assignees of Jerome P. Kroll, recovered in the Saginaw circuit court on appeal, a claim which had been rejected by the commissioners, for an alleged balance due on the price of logs sold and delivered by Kroll to the firm of C. & E. Ten Eyck, of which deceased was the only general partner. This contract was made November 23, 1878, and provided for the sale of two million feet of white pine logs cut and to be cut from the north half of section 13, the northeast quarter of section 14, and from section 12, all in town 20 north, of range 1 west; no log to be under 14 inches in diameter at the small end. For these logs payment was to be made at the sum of $5 per thousand, $3 payable when the logs were delivered within the Tittabawassee boom limits, and the remainder November 1, 1879. The logs were to be marked T E N, and to be scaled on

skids or on the bank, by a scale to be agreed on. It was claimed the logs were scaled and delivered in 1879, and that on the 19th day of July, 1879 there remained unpaid, and due or to become due, $3815.27. This would, if correct, indicate advances beyond the amount agreed on, as at $2 a thousand, which was the payment reserved until November, 1879, the postponed amount would have been $4294.26.

The jury found a verdict for the amount claimed, with interest from November 1, 1879.

There was testimony going to show the delivery of the amount of logs before mentioned, but the chief controversy seems to have been whether this contract continued to be the measure of the rights of the parties, and whether other transactions had not affected either the contract itself, or the balances arising out of the mutual dealings of the parties.

It appears that Egbert Ten Eyck died in August, 1879, before all of these logs came into the control of the firm which he represented, and that he ceased giving active attention to his business in person at his office in the spring of 1879. From some time in April or May Trevet McCormick was his book-keeper, exercising more or less supervision over business matters, but having no general authority to act without directions. On the trial a part of the controversy turned on the actual date and effect of a written agreement signed by Kroll, but bearing no written date, which purported to convey to Ten Eyck an interest of one-half in the pine timber cut or standing on certain lands named, and also to agree to cut, haul, mark, run and deliver all the timber on the lands referred to in the contract under which the demand in issue is made, at prices mentioned. The effect of this undated agreement, if in force, would seem to have been decisive of much or all of this controversy. The record does not contain as fully as might for some purposes be desired, all the means of judging the results of the various theories relied on during the trial.

The claimants opened their case by introducing a memorandum which they insisted indicated the existence on Ten

Eyck's books of evidence of the fulfillment of the contract relied on, and undertook and were allowed to show in connection therewith a figuring up by McCormick of five dollars a thousand on the lumber delivered, and certain alleged conversations with him, which they relied on as inducing them to purchase the claim from Kroll. All this testimony was objected to, but received against the objection. On the argument in this Court it was practically conceded that this testimony could not be relied on to establish the merits, but it was suggested it was proper as part of the *res gestæ* to show the good faith of the transfer from Kroll, and was otherwise unimportant because proof to the same effect was given from other sources.

The consideration of the assignment from Kroll to plaintiffs could in no way concern the defence, because the assignees could only take such rights as Kroll himself had in the premises. And the introduction of testimony which would suggest superior equities in *bona fide* purchasers of such a claim would necessarily be misleading.

But the record will not bear any such limited construction. This testimony was offered and received on the merits. Its obvious purpose and effect as admitted was to create a belief that Ten Eyck's books showed the claim to be well founded.

McCormick's testimony substantially contradicts the statements concerning his sayings and doings as reported by the testimony for plaintiffs. But he could not have bound the estate or Mr. Ten Eyck by his admissions if he made them. They were entirely beyond any authority which he possessed.

The only memorandum on the books was an entry showing the scale of certain logs as on the skids. It showed nothing concerning their acceptance or ownership, and nothing concerning any supposed rights of Kroll. Without the supplementary figuring and alleged statements of McCormick, this memorandum was of no consequence. But when received with these additions and connected with the purchase of the assigned claim, it is quite plain that the

jury might be expected to regard the whole as strong evidence that the balance claimed was shown to be due Kroll by the books of the concern itself against which it was asserted. With such an impression created in the beginning of the trial, a favorable result was made probable if not inevitable. But it was entirely improper and should have been shut out.

A very similar objection exists against the reception of another memorandum at a later stage of the cause. The court admitted by itself and separately from its context a memorandum entry, dated July 9, 1878, purporting to be a credit entry of half the profits of pine on certain lands named. At the end of this description the figures $1500 were placed inclosed in a circle. The defence objected to receiving this entry alone, and apart from its surroundings, but the court allowed it to be received as fixing the date of the undated contract. The defence subsequently put in the books themselves, whereby it appeared that this entry had never entered into the accounts and was not regarded in the balances. If the objection to the reception of this entry had no further bearing than its partial effect, possibly the error might have been cured by the subsequent reception of the other entries. But by receiving it as an independent entry for the purpose mentioned it was given a peculiar importance. There was nothing in the entry which had any legal tendency to connect it with the undated contract or with any other, and it could only have become important by its incorporation into Ten Eyck's account in some way which would favor that inference. The indications of the books themselves taken together do not seem to have that bearing so far as we can judge from the record. And it is certainly improper to garble accounts, when books are relied on as charging the estate.

So far as the undated contract is concerned, the rulings can only be tested by considering what appeared in evidence. The agreement was not drawn to be executed by Ten Eyck. It was in the first person singular, speaking in Kroll's name as the person to execute it, and was signed by

Kroll. It was found among Ten Eyck's papers after his death. This, according to well-settled rules of law, would raise a presumption of delivery, and would leave nothing open presumptively except its date. Mr. Wheeler swore positively to its preparation and to such facts as would establish a delivery, and fixed its date proximately but not precisely. Kroll fixed a different period of execution, and inferentially disputed its delivery. He did not deny its delivery to Wheeler, but did say he gave no instructions to have it delivered by Wheeler to Ten Eyck, and denied it was delivered to Ten Eyck by his authority. Beyond this he gave no explanations concerning its execution or how he came to leave it with Wheeler. Instead of showing by Kroll these facts, which do not appear to have been within the personal knowledge of Ten Eyck, and therefore may not have been within the statutory exclusion, an attempt was made to show by circumstantial evidence, that Ten Eyck did not accept the contract, and the charges complained of come up on this state of things.

There was some hearsay evidence received on this subject, and afterwards partially but not wholly excluded. A part of it was connected with the execution of certain securities from Kroll to Jesse Hoyt. In striking out this hearsay, the court declined to strike out what related to the giving of the security. Assuming that the testimony once given might be obliterated from the memory of the jurors, it was not so dealt with as to remove it from consideration. The execution of the securities was so mixed up with the rest, that such a general and brief ruling would fail to disentangle them from the other facts.

The charge also was open to criticism on the subject of acceptance of the contract. The jury were instructed in substance that in order to give effect to the contract it must have been not only left with Wheeler for Ten Eyck, but delivered by Wheeler to Ten Eyck, and accepted by him. Delivery to Ten Eyck personally and acceptance by him were dwelt upon. Upon these facts there was no dispute. Ten Eyck had and retained the contract, and when this

appeared it must be presumed he accepted it. The attention of the jury was turned to facts as doubtful which were not doubtful, and the controversy was not made to hinge on the real points in dispute. If Kroll completely executed and delivered the contract to Wheeler there seems to have been no foundation for a claim that it did not become operative, unless shown affirmatively to have been repudiated or abandoned. If delivered as operative the retention of it created presumptions which required to be overthrown in order to avoid it.

The judgment below must be reversed with costs and a new trial granted.

The other Justices concurred.