JACOB SELIGMAN ET AL. v. ESTATE OF EGBERT TEN EYCK.

*Contracts—Presumption of execution—Res gestæ—Striking out testimony —Impeachment of stenographic notes.*

53 285
69 348
69 349
53 285
74 526
53 285
s18ᴺᵂ 818
129 661

1. The possession of a contract establishes a presumption of its execution and delivery which must prevail until overthrown.

2. Where the execution and delivery of a contract were in dispute, one of the parties testified that the other went away while it was being drawn and that after it was finished he, the witness, said he would sign it and go and get the other party to complete it. The lawyer who drafted it testified that it was drawn under the instructions of

both parties while present, but that he thought it was sent to one of them unsigned by the other. He also stated that so far as its terms were concerned it was then finished. *Held,* that this was admissible as res gestæ, no change having been suggested by one party in the other's absence.

3. After the death of one of the parties to a disputed contract the subject matter of which has been dealt with as if in accordance with its terms, the other party cannot properly testify that he did not act under it, as this would be stating either a legal conclusion or a fact equally within decedent's knowledge.

4. A party to a disputed contract, in explaining a letter in evidence, was allowed, against objection, to testify to the circumstances under which it was written, and in doing so introduced irrelevant matter relating to another contract. The court, while directing this testimony to be struck out so far as it related to that contract and its damaging effect on the witness, ordered the rest to stand. The testimony covered private dealings between the parties, to which, as one of them was dead, the other could not testify and as the order gave no means of determining what should remain, and what should be thrown out, it operated to create uncertainty unless all was stricken out.

5. A stenographer cannot be allowed to contradict a witness by testifying to detached portions of evidence given by him on a former trial, but to which the witness' notice has not been called for purposes of impeachment.

6. Stenographer's notes are not depositions but mere minutes of verbal testimony and of no intrinsic force; and they can no more be used for impeaching purposes than if they did not exist, until the witness to be impeached has first been interrogated.

7. Mere memoranda appearing upon the pages of a ledger and journal fix no right or credits and are inadmissible in evidence, if they cannot be identified with any transaction or their purpose ascertained. And they cannot be treated as if they were different in any respect from what they really are, for the purpose of giving them significance.

Error to Saginaw. (Gage, J.) Feb. 8.—April 9.

Appeal in probate. Defendant brings error. Reversed.

*Wheeler & McKnight* for appellant.

*Wm. S. Tennant* for appellees.

CAMPBELL, J. This case comes up again on a record not

varying very greatly from the former one as reported in 49 Mich. 104. Some of the questions we find it difficult to distinguish from those decided there. The facts are very much confused, and in some respects not so intelligible as they probably were below.

The claim, as before, was for the balance unpaid on a log-delivery contract made by C. & E. Ten Eyck with Jerome P. Kroll, in November, 1878, for two million feet of logs. The amount delivered was somewhat more than this, and there was no dispute concerning what would have been payable had there been no other transactions. Mr. Ten Eyck died before the contract had been fully carried out. Plaintiffs are assignees of Kroll.

The principal controversy arose out of a written agreement, without date, which was signed by Kroll at a time which he fixes in July, 1878. Kroll claims this never was delivered. Defendants rely upon it as the basis of important rights. It purported to convey to Ten Eyck's firm, of which he was the only active partner, for $1500, an undivided half interest in all the pine timber on section 12 and parts of section 11, in town 20 north of range 1 west, subject to a balance due to the land-owners for purchase money, which was to be paid out of the proceeds. The contract further required Kroll to prepare and deliver this timber as well as certain logs on sections 13 and 14, which were not sold by this contract, and Ten Eyck was to pay $2.60 and $2.75 for charges in addition to the proper boomage and banking-ground dues.

There had been a previous sale to Ten Eyck of that portion covered by the $2.60 charge at $5 a thousand, and what was paid or assumed by Ten Eyck on the original land-owner's claims, and for cutting and delivery in the river, was to apply on the purchase. There were also more or less advances further entering into the accounts.

The contract of November, 1878, now in controversy, covered white pine common logs, to be cut or already cut, of a certain size, on sections 13 and 14 and 12. The price of five dollars was for logs delivered in the Tittabawassee boom lim-

its. A portion of the controversy referred to the fact that Kroll only retained a half-interest in the logs on section 12 if the undated contract remained in force. It cannot be said, as matter of law, that the contract of November is inconsistent with that of July to any such extent as to abrogate it if made. And it was not so ruled on the trial. And if actually made, so that title passed to anything under it, the title so vested would remain until something was done to restore it. The presumption of its execution and delivery derived from its possession by Ten Eyck must prevail until overthrown in some way. And the testimony bearing on this point becomes quite important.

Mr. Kroll's version of the matter is that Mr. Ten Eyck left the office of Mr. Wheeler while Wheeler was drawing the paper, and after it was finished he told Mr. Wheeler he would go and get Mr. Ten Eyck to complete it. That Kroll started to take the paper with him, and then said he would sign it and go and come back and let Ten Eyck take it. That Wheeler told him he had better sign a few lines below, so that any change might be put in below [probably above] his name. Kroll says he did not find Ten Eyck, and did not go back, and nothing was done about completing it at any time.

Mr. Wheeler denies Kroll's statements as to what the latter said to him about what was to be done to complete the agreement, and says that it was drawn under the instructions of both parties, communicated to him when they were present, but his impression is that it was sent unsigned to Mr. Ten Eyck. Having stated that it was sent by him to Ten Eyck as a finished paper, so far as its terms were concerned, this answer was ruled out as incompetent.

It appears to us to be quite material whether the paper did or did not embody all that the parties had agreed upon and instructed the draughtsman to insert. If it was the purpose of the parties to commit their stipulations to writing, the circumstance that when one had left, and the other suggested no change, the attorney dealt with it as complete, was a signifi-

cant part of the res gestæ, and proper to be considered among the other testimony.

And in the same connection Mr. Ten Eyck being dead, it was not proper to allow Mr Kroll to testify that he did nothing under the agreement. It was admitted on both sides that logs had been handled and delivered which were covered by the terms of this contract, which would come within it, if existing, unless other arrangements had been made with Ten Eyck. This testimony was either a legal conclusion which could only be drawn by the body bound to pass on the facts, or it was a statement of a fact in Ten Eyck's knowledge, and important to his interests. In either case it was improper.

Kroll having written a letter to Ten Eyck during the season of 1878, on February 15, at a time when one of the contracts known as the Emsley contract was running, and the letter being in evidence, was allowed under objection to state the circumstances under which the letter was written, and in doing so related at some length the difficulties which he and Mr. Ten Eyck encountered, and their dealings with Emsley, and anxiety, and his own repeated writing to Mr. Ten Eyck, and their final loss under the Emsley contract, and its consequences. Subsequently the court, being asked to strike out all of Kroll's explanations, ruled that it should be done so far as related to the Emsley contract and Kroll's being damnified by it, and ordered the rest to remain. This order gave no means of determining what was to be left in and what thrown out. And inasmuch as the testimony covered private dealings between Kroll and Ten Eyck, to which Kroll could not testify, the omission to define the admissibility operated to create uncertainty, unless all was stricken out, and the court directed the jury that a portion should remain.

It was error to allow the stenographer to testify to detached portions of McCormick's evidence on a former trial, to which McCormick's notice had not been called for purposes of impeachment.[1] If this stenographer's notes were—as they

---

[1] McCormick had been Ten Eyck's bookkeeper.

seem to have been—treated as a deposition, then, under the decision in *Lightfoot v. People* 16 Mich. 507, it was not permissible to allow the stenographer to pick out parts of it. But such notes are in no sense depositions. They are mere minutes of verbal testimony which are of no intrinsic force, and the rule of impeachment is the same as if no notes had been taken, so far as regards the necessity of first interrogating the witness sought to be impeached.

The court allowed certain ledger and journal entries on Ten Eyck's books to be regarded by the jury as tending to show that the July contract was not in force, and that the November contract was being carried out. This subject was to some extent referred to in our former decision. We think the entries could not be used for any such purpose. They appear under a heading, " Ortmann and Kroll logs." These are neither charges nor credits to Kroll, and consist on the one side of the entry of a series of notes apparently given at different dates, from June to December, 1878, for an aggregate of $6500, and an item of $596.05 for shrinkage in scaling. It does not appear to whom, or for what purpose, these notes were given, or whether they were paid. It does not appear by these entries, or otherwise, that anything was due under the November contract when these notes were given. But the entries convey no means whatever of identification or purpose. The same side of the page on another book contains two $1000 notes, and a charge of $102 for teaming, not identified or charged to anybody, and not provided for, so far as we can see, by either contract. On the other side of the first set of entries is an entry of a half interest in profits of pine on the lands mentioned in the undated contract, but entered as of July 9, 1878, which is the date given by Kroll. This is put at $1500, around which sum a line is drawn which is not explained on the book. This entry may indicate the purchase of the interest as set out in the July contract, but it certainly bears no indication to the contrary. The court allowed it to go to the jury, but ordered them to treat it as if no line were drawn around it. This was clearly error. The court could not change the books, and putting it in that

form, in connection with other remarks, seemed to indicate that it was a credit item on an account with Kroll, or for his benefit. There were also on the same side two items earlier than November, for something over two million feet of logs at prices marked, and at the close an entry, followed by two subsequent ones, of parcels of T E N logs, mostly on skids, and a part banked, aggregating 2,147,830 feet. No prices are carried out. We referred to this in our former rulings. These entries have no significance upon the present contest without explanations which no one but Mr. Ten Eyck could give. They furnish no basis for an account between these parties, and are mostly, apparently, memoranda which fixed no rights or credits, and to any one but the person who made them have no such significance as would justify a court or jury in guessing at their meaning.

The remaining questions, so far as material, are so closely dependent on what would be affected by our own views on the points already considered as not to make it worth while to refer to them, because upon another trial they may not be raised in just the same way as now. We therefore express no opinion upon them, unless so far as affected by what has been already said.

The judgment must be reversed and a new trial granted.

The other Justices concurred.